WUNSCHEL & SMALL, INC.

v.

The UNITED STATES.

No. 419–80C.

United States Claims Court.

Oct. 7, 1982.

See also, 1 Cl.Ct. 101.

Larry D. Dingus, San Francisco, Cal., for plaintiff. Dingus, Haley & Holderness, San Francisco, Cal., of counsel.

John C. Morland, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

Dwight D. Meier, Washington, D.C., of counsel.

## OPINION

SCHWARTZ, Judge:

Plaintiff sues for $764,000 as damages for an alleged breach of its contract to lay an irrigation water pipeline for the Bureau of Reclamation in El Dorado County, California, in the Sierra foothills. The contract period began in January 1977; the work was completed in August 1979, 166 days late. The Government withheld, as liquidated damages of $500 per day, $75,000 otherwise payable to plaintiff, and now counterclaims for an additional $8,000, for a total of $83,000 for the 166 days.

The two-fold claim of the plaintiff is, first, that the work was greatly delayed and its cost increased, extending completion for 116 days beyond schedule, by reason of the refusal of the Bureau's officers to allow the trees on the right-of-way to be cut sufficiently to give plaintiff access to the trench in which pipe was to be laid. Second, that plaintiff was improperly denied extensions of time of 115 days on which weather prevented work. The Government's position is that both contentions are without merit; that the claim of denial of access is an afterthought for which notice was not given as required; that in fact trees were cut as the contract contemplated; and that plaintiff was allowed all it was entitled by way of extensions for weather. The case

has been tried and the Government is upheld in all respects.

### The Claim of Denial of Access to the Trench

The Government made available to plaintiff as the contractor, a 50-foot wide right-of-way over the 13.8 mile route, of which about 43 feet was an easement for construction, obtained by the Government, and only the center portion of roughly 6 feet, sufficient for the pipe trench, would be a permanent Government easement. The easement ran through heavily timbered lands, residential property and fruit orchards. The Government was obligated to pay the private owners for any damage to trees. The private ownership of most of the right-of-way and the intense interest in the area in the preservation of trees are reflected in the explicit provisions in the contract, among them repeated statements of the control by the Government over the decision as to cutting of trees required for the work.

One contract clause, 1.5.10.a., provided in part that "in no event shall the contractor remove any trees, shrubs, or vines on the right-of-way or construction easements without the prior approval of the contracting officer." [1]

Another, clause 2.1.1., entitled "Clearing," provided that the portion of the right-of-way required for access to and for constructing the work "shall be cleared of all trees, brush, rubbish, and other objectionable matter," and, further, that "[o]nly those

1. "1.5.10. Interference with Existing Improvements

"a. General.—The pipelines and structures to be constructed under these specifications will be adjacent to, cross, or extend along existing improved property of others, including roadways, driveways, pipelines, fences, lawns, gardens, orchards, arboretums, cultivated lands, walls, and drains. The contractor shall conduct his operations in such sequence and such manner as to minimize disturbance to or destruction of improvements and to interfere as little as possible with the operations of property owners. Permits shall be obtained by the contractor at his expense for operations on rights-of-way of roadways and streets.

"If, in the opinion of the contracting officer, there is sufficient operating space to perform the work in a reasonable manner without removing or destroying existing improvements, the contractor shall perform the work without removing or destroying such improvements and in no event shall the contractor remove any trees, shrubs, or vines on the right-of-way or construction easements without the prior approval of the contracting officer.

"Where the contractor is prohibited by the contracting officer from removing existing improvements, he will be permitted to remove obstructions such as overhanging branches and to perform such pruning as is necessary for the prosecution of the work. The pruning and removal of branches shall be done in such a manner as to cause the minimum of damage to the existing improvements."

trees designated by the Contracting Officer may be cut." [2]

A third, 1.6.1., "Landscape Preservation" required that "[e]xcept where clearing is required for permanent works, for approved construction roads, and for excavation operations, all trees, native shrubbery, and vegetation shall be preserved and shall be protected from damage. . . ." [3]

Finally, there appeared a clause explicitly entitled "Preservation of Trees," again conditioning removal of trees on the approval of the contracting officer, and listing the trees not to be removed without such approval.

1.6.2.  Preservation of Trees

a.  Preservation.—All trees and shrubbery which are not specifically required to be cleared or removed for construction purposes shall be preserved and shall be protected from any damage that may be caused by the contractor's construction operations and equipment. The removal of trees or shrubs will be permitted only after prior approval by the contracting officer.

The following trees located along the El Dorado Main No. 2 Pipeline shall not be removed unless they are located within the pipe trench excavation:

The list which follows runs for 36 pages and contains over 1800 trees, identified by location on the right-of-way ("station") whether left or right of the center line, diameter and type of tree. The list begins as follows:

| Station | Left | Right | Diameter | Tree type |
|---|---|---|---|---|
| 14 + 12 | | 20 feet | 30 inches | Cedar |
| 14 + 18 | 6.3 feet | | 24 inches | Cedar |
| 14 + 21 | 19 feet | | 18 inches | Cedar |
| 14 + 22 | 22 feet | | 18 inches | Forked oak |
| 14 + 57 | 13 feet | | 24 inches | Cedar |
| 14 + 72 | 16.5 feet | | 30 inches | Cedar |
| 15 + 12 | 11 feet | | 18 inches | Cedar |
| 15 + 23 | | 23 feet | 30 inches | Cedar |
| 15 + 42 | 3 feet | | 48 inches | Forked oak |
| 16 + 09 | 12 feet | | 36 inches | Cedar |
| 16 + 19 | 12 feet | | 36 inches | Cedar |
| 16 + 88 | 12 feet | | 30 inches | Oak |
| 17 + 00 | Left side | | 2 to 3 inches | Cedars (scattered) |
| 19 + 50 | | 26 feet | 36 inches | Pine |
| 20 + 26 | 10 feet | | 6 inches | Apple |
| 20 + 28 | 12 feet | | 10 inches | Apple |
| 21 + 56 | | 1 foot | 18 inches | Cedar |
| 21 + 65.5 | On centerline | | 8 inches | Cedar |
| 21 + 75 | 1 foot | | 8 inches | Cedar |
| 21 + 88.5 | 10 feet | | 30 inches | Pine |
| 21 + 88.5 | | 1 foot | 14 inches | Pine |
| 21 + 90 | 7 feet | | 24 inches | Pine |
| 22 + 18 | | 10 feet | 8 inches | Pine |
| 22 + 27.5 | On centerline | | 4 to 6 inches | Cedar cluster |
| 22 + 27.5 | 16 feet | | 30 inches | Pine |
| 22 + 27.5 | 24.5 feet | | 24 inches | Pine |
| 22 + 30 | 30 feet | | 18 inches | Cedar |
| 22 + 36 | 31 feet | | 12 inches | Cedar |
| 22 + 37 | 10 feet | | 24 inches | Oak |
| 22 + 62 | 11.8 feet | | 24 inches | Pine |

2.  "2.1.1.  Clearing

"a.  General.—That portion of the right-of-way where required for access to and for constructing the work under these specifications shall be cleared of all trees, brush, rubbish, and other objectionable matter. Only those trees designated by the Contracting Officer may be cut. All other trees shall be protected from injury . . . ."

3.  1.6.1.  Landscape Preservation

"a.  General.—The contractor shall exercise care to preserve the natural landscape and

* * *

Once the work started, the Bureau's inspector at the site passed on the cutting of every tree on the right-of-way other than in the space needed for the trench. His instructions were to balance the contractor's needs against the Government's interest in preserving trees. Occasional protests by the plaintiff's site representative would concern the distance between the trees left standing or their proximity to the trench, and the consequent difficulty or awkwardness in moving equipment to the trench to excavate, suspend and lower the pipe into the trench and perform the other necessary operations. The equipment included ditch-digging backhoes, a side-boom pipelaying tractor and various other items of heavy equipment. The terrain was largely wooded and sometimes steep. There was a good deal of give and take about distances between trees, routes and alternative routes for access and what trees should be cut. A few decisions were presented by plaintiff to the inspector's superior for review.

In some cases, trees would be left standing either near the trench, or so close together as to limit access to only one piece of equipment. The contractor would be required to back out one tractor to permit another to get to the trench, or go around the tree to lay pipe on the other side, or to go over to the other side of the trench and lay pipe from there.

■ Plaintiff nevertheless does not attempt to build a case of individual unreasonable decisions of the Bureau's inspector not to cut a tree. Instead, plaintiff urges that it was entitled under the contract to, and did reasonably, conclude that 14 feet on each side of the trench would be clear cut—

shall conduct his construction operations so as to prevent any unnecessary destruction, scarring, or defacing of the natural surroundings in the vicinity of the work. Except where clearing is required for permanent works, for approved construction roads, and for excavation

that every tree in two 14-foot strips would be cut.

Clear cutting to such an extent would of course read out of the contract the several repetitions in the contract of the Bureau's right in its discretion to pass on the cutting of every tree. Plaintiff offers in support of its fanciful reading of the contract only the first sentence of clause 2.1.1.: "That portion of the right-of-way where required for access to and for constructing the work under these specifications shall be cleared of all trees, brush, rubbish and other objectionable matter." Plaintiff ignores the next sentence "Only those trees designated by the Contracting Officer may be cut." The two sentences doubtless require that the contracting officer not unreasonably withhold his approval of a cutting of a tree required for the work. But it is equally without doubt that the two sentences, not to speak of the other quoted provisions, cannot be read as contemplating the clearing of trees without exception in any area other than the trench.

No inference of permitted large-scale clear cutting is here possible, and if it was nevertheless drawn by plaintiff's principal, it was not merely unreasonable but irrational. The obvious intent of the contract was that trees should be preserved insofar as was possible, in the judgment of the Bureau, consistent with the need for access. The Government meant and said that while trees required to be cut for the work should be cut, the decision was for the contracting officer. The list of 1800 trees alone tells, indeed shouts, that the decision would be made by the Bureau on a case by case basis. No one who could read could conclude that this contract contemplated clear cutting of trees on the right-of-way.

operations, all trees, native shrubbery, and vegetation shall be preserved and shall be protected from damage which may be caused by the Contractor's construction operations and equipment...."

There is, moreover, not a scrap of paper to show that plaintiff did in fact read the contract as contemplating clear cutting. The testimony of a principal of the plaintiff that he computed the bid on an assumption of clear-cutting is rejected as incredible. His "assumption" was neither recorded nor communicated to anyone. Other testimony is that he asked the Bureau officer about clear cutting, was told that the contract forbade it, and was referred to the specifications.

The testimony of experts in pipelaying and seasoned government reclamation officers is that clear cutting is unheard of in the region; that the provisions in the instant contract concerning control of tree cutting are standard in Bureau of Reclamation pipeline contracts and are found in contemporaneous and comparable projects nearby with which plaintiff was familiar. Stretches of the right-of-way ran through orchards, farms and yards, whose owners had particular interest in preservation of their trees. No source can be found for any belief that clear cutting was conceivable. Plaintiff's contention would be groundless even in absence of any language on the subject in the contract.

■ Another contention of the plaintiff is that there were no consistent criteria for tree cutting; that in some instances the Government's representative allowed cutting of trees more than 15 feet from the trench and disallowed cutting of trees near the center line; and that in some instances cutting was allowed of trees on the list in clause 1.6.2. It is said that this amounted to a waiver of strict adherence to the contract, rendering it ambiguous and deserving of the construction urged by plaintiff, that is, clear cutting for 14 feet on each side.

This contention, too, has no merit. The practice described—of cutting some and not other trees—was just what the contract contemplated by the repeated injunctions that the decision and thus the discretion of the contracting officer should control what trees should be cut and what trees left standing. The criterion was to be and was a balance of the contractor's needs with the Government's interest in preserving trees. This constituted neither waiver of discretion nor ambiguity, but a carrying out of the text and intention of the contract.

After the pipe was laid, plaintiff, under the pressure of its very substantial delays, losses and liability for liquidated damages, hit upon its dream of clear-cutting as a rationalization for laying the blame on the Government and not itself. The evidence is that plaintiff, without experience in large pipeline projects over such rugged terrain as here, performed inefficiently, and that its inefficiency and its failure to hire a second pipelaying crew were the causes of its losses.

It appears, also, that plaintiff did not give notice to the Government as required by the contract, of its claim of damage by reason of denial of access. Plaintiff would meet this obstacle by its allegation of a constant stream of oral protests, but the evidence is to the contrary.

### The Claim of Delay by Weather

Plaintiff's second claim is for 115 days delay by weather in the winter of 1978–79, not allowed by the contracting officer. The standard contract clause provides for extensions of time for various causes, among them "unusually severe weather." Plaintiff was allowed an extension of 11 days for such weather.

Plaintiff has made no attempt to show, and does not argue, that the weather on the additional days was "unusually severe" in the sense required by the cases that it be unseasonably severe for the place in which it occurred. *Broome Constr. Inc. v. United States,* 203 Ct.Cl. 521, 531, 492 F.2d 829, 835 (1974); *Cape Ann Granite Co. v. United States,* 100 Ct.Cl. 53, 71–72 (1943), *cert. denied,* 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080 (1944); *see* Nash & Cibinic, *Administration of Government Contracts* 237–38 (1981). Rather, the contention is that vari-

ous excused delays extended the completion date into a time of weather described as "inclement," and that work was prevented by that weather on 82 working days, including every day from January to early April 1979.

The contention is greatly exaggerated in fact; weather data shows that on many of the working days involved, rain and snow either did not fall or together amounted to less than one quarter inch. Moreover, even on days of significant precipitation, whether all work, or only pipelaying work, was prevented is not clear.

■ The duration of a time extension granted because of excusable delay depends on the amount of time that the excusable cause will actually delay performance. Nash & Cibinic, *supra,* at 251. It follows that where excusable delays prolong a job into a season of unfavorable weather not anticipated under the original completion date, the extension given for such delays should take into consideration the foreseeable bad weather. *Id.; compare Urban Plumbing & Heating Co. v. United States,* 187 Ct.Cl. 15, 24–26, 408 F.2d 382, 387 (1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970) (government's offer of extension for excused delay, to end in Alaskan mid-winter when work was impossible, held meaningless) *with Witzig Constr. Co.,* IBCA 92, 60–2 BCA ¶ 2700 (1960) (where 8-day excusable delay prolonged completion into winter, contractor allowed 16-day extension because specialized construction would then take twice the usual time).

In the present case, on the basis of excusable delays, which included a strike and change orders, extensions were granted from the original completion date in September 1978 to a date in February of 1979. In its requests for these extensions in September 1978, plaintiff did not argue that the extension into winter should be elongated for the foreseeable inclement weather. Even now, plaintiff does not challenge the extensions granted as improper. Instead, it contends that the inclement weather, though not unusually severe, should itself

constitute an independent ground for excusable delay, and so merit extensions by its own right under the contract provision. This argument is quite different from that permitted under the above-stated rule; in effect, plaintiff would have the court read into the standard contract clause another class of weather as ground for excusable delay, in addition to the long-required proof of weather that is "unusually severe." No cases, cited or found, support such an interpretation of the clause. Plaintiff's contention is rejected.

Plaintiff's claim of delay by weather thus has no discernible merit, and its complaint is dismissed. There is therefore no valid opposition to the Government's counterclaim for an additional $8,000 in liquidated damages, and the Government should have judgment in that amount.

It is therefore ordered and adjudged that defendant have and recover from the plaintiff the total sum of $8,000.

### FINDINGS OF FACT

#### 1. Background

1. Plaintiff's claim arises from its construction of an irrigation water transmission pipeline and reservoir known as El Dorado Main No. 2, in El Dorado County, near Placerville, California.

2. (a) Main No. 2 was built pursuant to contract No. 7–07–DC–07238 of the Department of Interior, Bureau of Reclamation and according to Specifications No. DC–7238 (1976).

(b) The specifications were published in the fall of 1976, and bids for the project were opened by the Bureau on November 10, 1976.

(c) On January 10, 1977, the project was awarded to plaintiff as the second low bidder. The low bidder had been allowed to withdraw its bid because of calculation errors.

(d) Paragraph 1.2.3.a. of the contract required that work be completed within 600 calendar days of the receipt of notice to proceed.

(e) Plaintiff received formal notice to proceed on January 12, 1977. The original completion date for the contract was thus September 4, 1978, later extended because of excused delays to March 7, 1979.

(f) Initial clearing took place from February 1, 1977 to early June 1977.

(g) Pipelaying took place from May 16, 1977 to July 13, 1979.

(h) The project was substantially completed on August 20, 1979, 166 days beyond the completion date of March 7, 1979 as extended.

3. The principal features of the work consisted of the furnishing and laying of approximately 13.8 miles of pipe and the construction of six pressure reducing structures, a diversion structure, a flowmeter structure, a concretelined reservoir and related structures.

4. (a) The pipeline was located in rugged terrain in the foothills of the Sierra Mountains. Large portions of the right-of-way ran over heavily timbered areas.

(b) Paragraph 1.5.1. of the Specifications recommends that bidders visit the site and satisfy themselves as to existing conditions affecting the work to be done.

5. Wunschel & Small, Inc., the plaintiff, is a California company engaged in utility, grading, paving and structural work. It had previous pipeline experience, but never a job of the magnitude of El Dorado Main No. 2 or one presenting such rugged terrain as was here the case.

6. (a) The major issue in the case is whether plaintiff was promised, or reasonably expected, that it could clear cut the trees for 14 feet on both sides of the trench in which pipe was to be laid. The failure of the Government to allow such cutting caused plaintiff, it contends, to be denied reasonable access to the trench and to incur the extra costs claimed as damages. Plaintiff further claims a 157 calendar day excusable delay because of insufficient access.

(b) A second issue in this case is presented by a weather claim, on which plaintiff claims an excusable delay of 115 calendar days or 82 working days.

## Tree Preservation and Clearing—Contract Claims

7. The Government had a permanent easement for the pipeline only for the land under the contemplated trench. As to the remainder of the right-of-way, it had an easement for construction, and it was obligated to recompense the owners for any damage to trees.

8. (a) The first subparagraph of paragraph 1.6.2.a. of the Specifications is entitled "Preservation of Trees" and provides that

All trees and shrubbery which are not specifically required to be cleared or removed for construction purposes shall be preserved and shall be protected from any damage that may be caused by the contractor's construction operations and equipment. The removal of trees or shrubs will be permitted only after prior approval by the contracting officer.

(b) Such provisions limiting tree-removal are typical of tree removal restrictions found in pipeline construction contracts let by federal agencies in the Sierra Mountain region.

(c) Companies engaged in pipeline construction normally expect that in jobs in the Sierra Mountain region of California, they will be limited by tree removal restrictions.

(d) Mr. Leo Tuccori, whose qualifications as an expert in the pipelinelaying industry will be given below, testified to his opinion that the industry understands such language as is quoted above to mean that a contractor cannot take out any trees without prior approval.

9. (a) The second subparagraph of paragraph 1.6.2.a. of the Specifications provides that:

The following trees located along the El Dorado Main No. 2 Pipeline shall not be removed unless they are located within the pipe trench excavation:

(b) There follows a 36-page list of trees within the 50-foot right-of-way throughout the project. Some 1850 trees are listed.

For each tree, the list specifies its location by station number along the route and the number of feet to the right or left of the right-of-way center line. The kind of tree and trunk diameter size are also specified. Thus:

| Station | Left | Right | Diameter | Tree type |
|---|---|---|---|---|
| 14 + 12 | | 20 feet | 30 inches | Cedar |
| 14 + 18 | 6.3 feet | | 24 inches | Cedar |
| 14 + 21 | 19 feet | | 18 inches | Cedar |
| 14 + 22 | 22 feet | | 18 inches | Forked oak |
| 14 + 57 | 13 feet | | 24 inches | Cedar |
| 14 + 72 | 16.5 feet | | 30 inches | Cedar |
| 15 + 12 | 11 feet | | 18 inches | Cedar |
| 15 + 23 | | 23 feet | 30 inches | Cedar |
| 15 + 42 | 3 feet | | 48 inches | Forked oak |
| 16 + 09 | 12 feet | | 36 inches | Cedar |
| 16 + 19 | 12 feet | | 36 inches | Cedar |
| 16 + 88 | 12 feet | | 30 inches | Oak |
| 17 + 00 | Left side | | 2 to 3 inches | Cedars (scattered) |
| 19 + 50 | | 26 feet | 36 inches | Pine |
| 20 + 26 | 10 feet | | 6 inches | Apple |
| 20 + 28 | 12 feet | | 10 inches | Apple |
| 21 + 56 | | 1 foot | 18 inches | Cedar |
| 21 + 65.5 | On centerline | | 8 inches | Cedar |
| 21 + 75 | 1 foot | | 8 inches | Cedar |
| 21 + 88.5 | 10 feet | | 30 inches | Pine |
| 21 + 88.5 | | 1 foot | 14 inches | Pine |
| 21 + 90 | 7 feet | | 24 inches | Pine |
| 22 + 18 | | 10 feet | 8 inches | Pine |
| 22 + 27.5 | On centerline | | 4 to 6 inches | Cedar cluster |
| 22 + 27.5 | 16 feet | | 30 inches | Pine |
| 22 + 27.5 | 24.5 feet | | 24 inches | Pine |
| 22 + 30 | 30 feet | | 18 inches | Cedar |
| 22 + 36 | 31 feet | | 12 inches | Cedar |
| 22 + 37 | 10 feet | | 24 inches | Oak |
| 22 + 62 | 11.8 feet | | 24 inches | Pine |
| 23 + 03 | 1 foot | | 8 inches | Pine |
| 23 + 29 | 1 foot | | 8 inches | Cedar |
| 24 + 77.5 | | 13.5 feet | 18 inches | Pine |
| 24 + 80 | 2.5 feet | | 18 inches | Pine |
| 24 + 97 | 28 feet | | 20 inches | Pine |
| 24 + 98 | 24 feet | | 36 inches | Pine |
| 25 + 02 | 1 foot | | 12 inches | Oak |
| 25 + 07 | | 18.5 feet | 24 inches | Oak |
| 25 + 09 | 12 feet | | 26 inches | Pine |
| 25 + 23 | | 19.5 feet | 18 inches | Oak |
| 25 + 29 | | 9 feet | 38 inches | Pine |
| 25 + 68 | | 21.5 feet | 24 inches | Oak |
| 25 + 70 | 11.5 feet | | 24 inches each | 2 Oaks |
| 26 + 01 | | 21.5 feet | 12 inches | Oak |

(c) Large numbers of trees on the foregoing list are located within 17 feet of the center line of the right-of-way, *i.e.*, within 14 feet of the trench.

10. Paragraph 1.6.2.b. of the Specifications provides that

The contracting officer will determine the method of repair, treatment or resto-

ration to be used for injured trees and shrubs as recommended by an experienced horticulturist or tree surgeon provided by and at the expense of the contractor.

11. The Plan and Profile Drawings of the route in the Specifications indicate, by a circle with a dot in the center, the approximate location of trees in the right-of-way.

12. Paragraph 1.5.10.a. of the Specifications provides in part that

a. General.—The pipelines and structures to be constructed under these specifications will be adjacent to, cross, or extend along existing improved property of others, including roadways, driveways, pipelines, fences, lawns, gardens, orchards, arboretums, cultivated lands, walls, and drains. The contractor shall conduct his operations in such sequence and such manner as to minimize disturbance to or destruction of improvements and to interfere as little as possible with the operations of property owners. Permits shall be obtained by the contractor at his expense for operations on rights-of-way of roadways and streets.

If, in the opinion of the contracting officer, there is sufficient operating space to perform the work in a reasonable manner without removing or destroying existing improvements, the contractor shall perform the work without removing or destroying such improvements and in no event shall the contractor remove any trees, shrubs, or vines on the right-of-way of construction easement without prior approval of the contracting officer.

Where the contractor is prohibited by the contracting officer from removing existing improvements, he will be permitted to remove obstructions such as overhanging branches and to perform such pruning as is necessary for the prosecution of the work. The pruning and removal of branches shall be done in such a manner as to cause the minimum of damage to the existing improvements.

13. Portions of the pipeline right-of-way ran through pear and apple orchards, residential property, near ornamental trees and other existing improvements.

14. Paragraph 1.5.10.c. of the Specifications provides that

The pipeline will cross through pear and apple orchards at various points and only those trees shall be removed as directed by the contracting officer. Trees adjacent to pipe trenches shall be carefully trimmed, as directed, in order to keep damage to trees to a minimum.

15. Paragraph 1.5.10.d. provides in part that special precautions shall be taken by the contractor where the pipeline crosses through private arboretums and the grounds of the Institute of Forest Genetics of the Forest Service and that no trees shall be removed or damaged without approval of the contracting officer.

16. (a) Paragraph 2.1.1.a. of the Specifications provides in part that

That portion of the right-of-way where required for access to and for constructing the work under these specifications shall be cleared of all trees, brush, rubbish, and other objectionable matter. Only those trees designated by the contracting officer may be cut. All other trees shall be protected from injury.

(b) Plaintiff relies particularly on the first sentence of the foregoing excerpt. The Government points to the second sentence.

17. All costs of compliance with Specification paragraphs 1.5.10., 1.6.1., 1.6.2. and 2.1.1. were under the contract to be borne by the contractor and included in the bid price.

18. The picture on the cover of the bound Specifications shows a contractor laying pipe of the same type as that installed by plaintiff under the contract. There is no clearing of trees on the side of the ditch opposite the side on which the crew is working.

### Bid Preparation and the Alleged Expectation of Clear Cutting

19. Samuel F. Small, plaintiff's president and general manager, prepared plaintiff's bid for the project.

20. (a) In preparing plaintiff's bid for pricing the pipeline installation portion of the work, Mr. Small first calculated the inch-feet of pipe to be installed, by multiplying the diameter of the pipe times the length of the pipe. Next, he multiplied the inch-feet of pipe times the estimated labor, material and equipment cost of installing an inch-foot of pipe.

(b) He estimated that there would be 1,854,105 inch-feet of pipe which could be installed for an estimated $0.20 per inch-foot, giving an installation cost estimate of $370,821.

(c) His overall projected costs for the job were $3,919,728 and the bid price which he submitted was $4,638,000.

21. The bid was based upon plaintiff's review of the plans and contract specifications for the project, its on-site investigation of the entire length of the project and the appurtenant right-of-way, quotes received by it from subcontractors and suppliers, its previous experience in pipeline construction using similar materials and equipment, a conversation with the Bureau's Chief of the Field Division, a visit to the site of, and a comparison with a similar ongoing Bureau pipeline project, Pleasant Oak Main.

22. (a) At the time Small prepared the bid, he testified, he anticipated that essentially every tree within 14 or 15 feet of each side of the trench would be cut down. Since the trench is generally 5 feet wide, Mr. Small was saying that he assumed that he would be allowed to clear cut 33–35 feet out of the center of the 50-foot right-of-way. He felt that the interpretation of the specifications by the contracting officer would give him ample room to perform his contract.

(b) He did not, before the bid was made, record this assumption in writing or tell any one of it.

(c) On November 8, 1976, two days before the bid openings, Small and Otto Wunschel, plaintiff's vice-president and construction supervisor, visited Mr. Marvin Smith, the then Chief of the El Dorado Field Division of the Bureau of Reclamation. Other prospective bidders also consulted with Mr. Smith in the period before the bid openings.

(d) Smith retired on April 1, 1977. He had worked on numerous Northern California pipeline construction projects for the Bureau in the capacities of Division Chief, Chief of Surveys, Location Specialist and Principal Inspector. He had been employed by the Bureau of Reclamation for 30 years.

(e) At the meeting, Small and Wunschel asked questions about the bench cut in the project, tree clearing, restoring the right-of-way elsewhere than on the bench cut, and other aspects of the job. A bench cut requires cutting a shelf in rock and laying the pipeline on the "bench" part of the cut.

(f) With regard to tree clearing, Small and Wunschel wanted to know if they could essentially clear cut the right-of-way. Smith told them that they could not and referred them to the language in the specifications.

(g) Neither Small nor Wunschel asked whether they could clear cut a specific number of feet, such as 14 feet, on each side of the trench.

23. At the time plaintiff submitted its bid, Otto Wunschel did not, he testified, anticipate that plaintiff would be allowed to cut down every tree within 14 feet of both sides of the trench. Small did not tell Otto Wunschel that plaintiff needed or expected 14 feet of clearing on both sides of the trench. Wunschel nevertheless anticipated, he testified, that he would be given a minimum of 14 feet on one side of the ditch.

24. (a) Plaintiff operates in the Lake Tahoe area and is familiar with the regulation of the Lake Tahoe Regional Planning Authority that trees cannot be harmed without approval.

(b) Plaintiff is aware that the Forest Service generally requires contractors engaged in building pipelines in areas under its jurisdiction in the Lake Tahoe region to obtain prior approval before cutting down any trees.

25. (a) The practice of the Bureau of Reclamation is to make tree removal deci-

sions on pipeline projects on a case-by-case basis in the field.

(b) The Bureau of Reclamation has never in its pipeline operations allowed the clear cutting of trees for 14 or a similar number of feet on both sides of the trench.

### Initial Clearing and Notice of Disagreement

26. On January 31, 1977, at the preconstruction conference held by the Bureau with the contractor's representatives, the contractor was told that if it received directives which it did not consider to be part of the contract, it should perform the work and then give written notice that it did not agree that the work directed was part of the contract, after which a determination would be made under the contract.

27. Paragraph 1.1.5. of the Specifications, entitled "Documentation of Disagreements," provides that:

If the contractor disagrees with any direction, instruction, interpretation, or determination of the contracting officer, his authorized representative, or an inspector, he shall immediately ask, in writing, for a written decision from the Contracting Officer or his authorized representative.

28. (a) Paragraph 3(b) of the General Provisions portion of the contract (Standard Form 23–A) states, in part, that an oral order (including an interpretation) of the Contracting Officer will not be deemed a change in the Specifications or entitle the contractor to an equitable adjustment unless

the Contractor gives the Contracting Officer written notice stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

(b) Paragraph 3(d) of the General Provisions provides that

Except for claims based on defective specifications, no claim for any change under (b) above shall be allowed for any costs incurred more than 20 days before the contractor gives written notice as therein required.

29. Initial clearing operations commenced on February 1, 1977, and ended in early June 1977. After completion of these operations, an occasional tree was removed during pipelaying. This was done on an individual basis when the contractor was unable to get its equipment through otherwise.

30. (a) On February 22, 1977, Small visited Marvin Smith and stated that he did not agree with the Bureau's interpretation of the clearing portion of the Specifications; that he felt that paragraph 2.1.1 of the Specifications gave him the right to remove any trees that he felt needed to be removed for the pipelaying operation.

(b) Smith responded that under his interpretation of the Specifications he could not allow such clearing. He said that the removal of trees other than those in the pipe trench excavation would be in the discretion of the contracting officer in accordance with paragraph 2.1.1.

(c) Smith also told Small that if he still wished to pursue the matter he should write a letter to the Bureau stating his complaint.

31. (a) Between February 22, 1977, and September 14, 1978, the Bureau did not receive a written notice that the plaintiff disputed the Bureau's interpretation of the amount of clearing to which plaintiff was entitled under the Specifications or that it might assert a claim concerning that matter. One exception had to do with three trees said to have been damaged by plaintiff.

(b) Smith regularly visited the job work site and frequently had conversations with Small and other of plaintiff's personnel regarding the project. Smith did not recall any further expressions of disagreement on the subject.

32. (a) The first time that the Bureau learned that the plaintiff might be considering making a claim based upon alleged insufficient tree removal was on September 14, 1978, when plaintiff's counsel informed the Bureau of such a possibility.

(b) This was after the original contract completion date of September 4, 1978, and long after initial clearing, which continued from February to June 1977, and some pipe-laying, which went on from May 16, 1977 to July 13, 1979.

Clearing Operations

33. The standards which Smith and his successor, James Tally instructed the clearing inspector to use in determining the clearing to be allowed were these:

34. (a) First, trees should be clear cut from the area of the trench excavation, that is, about 5½–6 feet on the center line of the right-of-way, and other trees should be removed to give access on one side of the trench to the trench excavation equipment. Such equipment is normally the largest type of equipment on the job. It is restricted in its ability to move about on the right-of-way; to dig the ditch it must follow the right-of-way center line.

(b) Second, such trees should be removed as in the inspector's judgment would permit the passage of equipment to string and lay the pipe, and to backfill the trench.

(c) Clearance should not necessarily be on one side or the other, but the contractor's wishes as to whether he desired to work on the one or the other side should be taken into consideration.

(d) Cutting of trees should be conducted so as to minimize the visual and ecological impact of the construction, while allowing the contractor sufficient room to proceed with his construction activities.

35. (a) Mr. James Wunschel, an employee of the plaintiff, supervised clearing, grading and levelling, compacted back fill, air blow off valve, and final clean up operations. Prior to the present job, he had had three years of experience in pipeline construction.

(b) He was generally familiar with pipe laying procedures, such as excavating, placing of pipe, back filling, and the like, having been involved in such work while employed by a pipe-laying contractor early in his career.

36. Larry W. Zakrajsek was the Bureau of Reclamation inspector for the clearing operations. He has a B.S. in biology, with a minor in chemistry, from Southern Colorado State College. From 1973 through 1975, he worked in construction inspection. His duties included inspection of the clearing activities for the construction of a roadway, concrete placements, and other construction projects.

37. James Wunschel and Zakrajsek worked side by side during clearing.

38. In practice what happened was this:

(a) An area 5½ to 6 feet on either side of the center line of the trench was the amount of clearing allowed for excavation purposes. Additional clearing was permitted to create a travel way or access path for the contractor's equipment.

(b) The travel way or access path was provided along only one side of the proposed trench line but not necessarily a continuous path adjacent to the trench. On occasion a tree was left standing within the adjacent access pathway. This would require the contractor to lay pipe up to the tree, and then carry the next pipe section around the tree and lay it from the other side of the tree.

(c) At times the travel way was not provided immediately adjacent to the trench because of considerations involving terrain and the way in which trees were clustered. In some situations Zakrajsek determined that it was visually or ecologically desirable to leave a single tree or a small number of trees standing adjacent to the trench, while cutting or clearing some smaller or lesser grouping of trees further away from the trench line, which would give the contractor access around the tree or trees that were left standing adjacent to the trench.

39. The width of the travel way for access of equipment to the trench was determined by Zakrajsek in conjunction with James Wunschel. Together they measured at 12 feet the width of the largest piece of equipment on the job at the time of initial clearing. This was an excavator known as the Poclaine 150. It was about 11 feet to 11½ feet wide.

40. The widest piece of equipment thereafter used for most of the the actual pipelaying operation was a side-boom caterpillar tractor measuring 12 feet in width. Carrying a 2 or 3 foot wide pipe, it would have an overall machine and material width of 14 or 15 feet. It was not owned by the contractor or brought to the job during clearing but was first brought to the site in mid-July 1977, after initial clearing was completed in early June.

41. As they walked over the right-of-way, James Wunschel and Zakrajsek discussed, on a tree-by-tree basis, which trees should be saved and which trees should be cut. In the instances in which the space between two trees was close to the minimum distance needed for access, Wunschel would explain to Zakrajsek why he thought the distance between the two trees was insufficient. If Zakrajsek agreed, one of the trees would be removed; if not, the trees would be left. Zakrajsek had the responsibility and made the decision where a disagreement arose.

42. Smith retired on April 1, 1977 and Mr. James Tally, who succeeded him as Chief of the El Dorado Field Division was assigned to the project.

43. Tally had been employed by the Bureau of Reclamation for 20 years in connection with various construction projects. He had served as a construction inspector for three pipelines in El Dorado County, California: the Pleasant Oak Main, the Pleasant Valley Lateral, and the Fort Jim Lateral.

44. When Mr. Tally arrived at the job, the greater part of the clearing had been completed.

45. While James Wunschel occasionally discussed with Mr. Smith or his successor during their visits to the project a desire for removal of more trees, Wunschel did not record any of his disagreements with Zakrajsek, did not ask for clear cutting on both sides of the trench, and did not make any written complaints about tree cutting.

46. Neither Smith nor Zakrajsek informed Mr. Tally, upon his arrival on the job, that there were any generalized problems with the contractor regarding tree removal. Exceptions concerning individual trees are noted below.

47. Plaintiff's representatives at no time told Mr. Tally that they needed a cleared path of 14 feet on both sides of the trench to move equipment.

### Specific Clearing Disputes

48. In a few instances, during initial clearing, involving approximately five to seven trees, Zakrajsek reported to Tally a disagreement with the contractor about the removal of a particular tree. Tally instructed Zakrajsek to defer cutting the trees until pipelaying operations, when it would be determined whether it was necessary to do so.

49. Zakrajsek's daily inspection reports normally recorded, by station, the progress that had been made on the job that day, and any serious problems that had developed during the day or disagreements with the contractor on the right-of-way.

50. The plaintiff's daily reports covering the clearing operations, February 1, 1977, to June 3, 1977, reflect no disagreement between the Bureau and the contractor over clearing.

51. (a) Plaintiff's Exhibit No. 35, Tab No. 4, entitled, on page 32, "Schematic Diagram of the Tree Obstructions," is a continuous 71 page chart which shows a center line trench of about 6 feet; it shows plaintiff's anticipated access of 14 feet on each side of the 6 foot trench, as well as trees that were removed and trees that were still standing at the time the contract was completed.

(b) The scale is 10 times more compressed horizontally than vertically. As a result, trees appear to be 10 times closer together than they actually are. A tree shown to be four units away from another is actually 40 feet away. Also, tree diameters are not drawn to scale, and no account is taken of curves on the right-of-way; with curves "straightened," the apparent distance between trees on the outside of the curves is reduced.

(c) Defendant's exhibit 11 is also a chart of the pipeline with trees removed. It is true to scale, with the exception of tree trunk diameters, which are not exact.

(d) Both exhibits show trees left standing on both sides of the trench, within 14 feet of the 6 foot trench area.

(e) The plaintiff was required on many occasions to maneuver its pipelaying equipment between and around these trees left within 14 feet of the trench. In some instances it would back out one piece of equipment to make room for another. In some it would lay pipe up to a blocking tree, then go around on the other side to continue the laying. In some instances, plaintiff was required to go to the other side of the ditch.

### Progress in Pipelaying Operations

52. According to the inspector's daily reports, mainline pipe was first laid on about May 16, 1977, and pipelaying ended on approximately July 13, 1979.

53. (a) At the outset of its pipelaying operations, plaintiff fell behind its pipelaying schedule of 345 feet per day, and this continued throughout.

(b) During the first month of pipe installation, namely May 1977, plaintiff's construction program called for an average of 345 feet of installation per day. Plaintiff actually averaged less than 300 feet per day.

54. Otto Wunschel kept a diary throughout the entire period that he was in charge of the project for the plaintiff. Problems other than tree removal were constantly being recorded. No record appears of problems concerning tree removal.

55. Tally kept a daily diary throughout the time he was assigned to the project.

56. Small did not complain to Tally that progress was slow because of the presence of trees in the right-of-way.

57. (a) On several occasions, Tally noted in his diary that he discussed with Small and Bureau officials his concern over the plaintiff's slow rate of progress.

(b) On several of these occasions Small responded that he would complete the job on schedule.

(c) Small maintained, until June 1978, that the job would be completed on time by September 1978.

58. On June 21, 1978, Tally's diary shows a first general reference connecting tree removal and progress. On that day, the diary notes

Sam [Small] is very negative and continues to procrastinate concerning what he wants to do, or what he intends doing, yet he will not hire sufficient good people to do the job. He continues to beef about insufficient ROW [right-of-way] etc.

He mentioned a shortage of cement in future although he authorized his supplier to use tested (Gov.) all winter. He also mentioned a steel shortage but yet his schedule shows struc. complete now.

59. (a) Tally noted in his diary his concern that the plaintiff did not have an adequate labor force, as well as problems the plaintiff had with its equipment.

(b) He recorded incidents of employee deficiency in performance or absence from work, damage to materials and improper deliveries, and problems caused by equipment failures.

60. (a) On a number of occasions the Bureau urged the plaintiff to hire additional personnel to increase its progress.

(b) On April 24, 1978, the Bureau wrote to plaintiff pointing out that at its rate of progress to date, plaintiff "cannot possibly complete all work by the scheduled completion date of September 4, 1978." The letter further indicated that the time extension to which it appeared that plaintiff would be entitled on the basis of unusually severe winter weather would not be large enough to affect plaintiff's ability to complete the contract on time. The letter urged plaintiff to increase its forces sufficiently to at least double its present production.

(c) In July plaintiff notified the Bureau that because of a strike at a pipe supplier it was suspending trenching operations.

(d) On July 28, the Bureau responded that plaintiff "should be adding personnel to your operation rather than laying them off." This letter recalled the letter of April 24 regarding lack of progress, and stated further

I am aware that a stoppage of pipe delivery has caused suspension of pipe laying activities. However there is an extensive list of work on this project which can and should be done. There are several months work on the reservoir and related structures. Air valves, turnouts, blowoffs and concrete risers should be installed. Decks should be installed on the pressure reducing structures. Backfill must be placed to restore natural ground where benching was performed prior to trench excavation. General clean up should be instigated throughout the job. Approximately 2000 feet of trench which has been backfilled without compaction must be re-excavated and the backfill compacted.

62. On September 14, 1978, the Bureau wrote to plaintiff that to that date plaintiff had not responded to the Bureau's written inquiries of April 24, 1978 and July 28, 1978, regarding how plaintiff planned to complete the remaining work under the contract.

63. (a) Mr. Leo Tuccori is the president of TW Construction Company, Inc., of Reno, Nevada. Mr. Tuccori has been involved in the pipeline construction industry for approximately 32 years, has installed main and irrigation pipelines, and has constructed numerous pipelines in the Sierra Mountain range. Mr. Tuccori is an expert in the field of pipeline construction, and gave expert opinion testimony on that subject.

(b) He testified to his opinion that on a pipeline construction job of the magnitude of the instant project, he would use several pipelaying crews to accomplish the work.

(c) Plaintiff did not add a second crew.

64. (a) Plaintiff's labor force was less than that used in a comparable job and its lack of progress was in all likelihood caused by a labor force inadequate to perform a job of the magnitude of the instant project in the scheduled time.

(b) A contributing cause was in all likelihood plaintiff's lack of experience. The present job was three times the size of any past pipeline job by plaintiff in terms of dollar amount. Plaintiff had no experience with the installation of pipelines in such rugged terrain as was here involved. No previous job had included a bench cut comparable to that included here.

65. A chart introduced by the Government sets out, by month, the average production on days on which the pipe was installed on stretches of right-of-way in which there were no trees within 14 feet of either edge of the trench and the average production on days in which pipe was installed in stretches in which there were one or more trees standing within 14 feet of at least one edge of the trench.

66. (a) During the 10 days in May 1977 when pipe was laid—the first days of pipelaying—the plaintiff laid an average of 321 feet on the days when it worked on stretches where trees were standing within 14 feet of the trench and an average of 271 feet on days when it worked on stretches when there were no trees within 14 feet of the trench.

(b) In the 22 months in which plaintiff installed pipe both on days with trees and days without trees, plaintiff made more progress, on the average, on days in which there were trees.

(c) The various charts and statistical analyses put in evidence by the parties do not prove that the existence of trees within the 14 foot area of the trench enhanced pipelaying, in view of variables not considered by either party.

(d) There is, however, no evidence in the record that trees hindered the progress of pipelaying on the project.

Similar Projects

67. In El Dorado County, California, Smith had inspected or located the El Dorado Main, a project comparable to the instant project and other comparable projects and lateral attached pipe lines.

68. (a) The El Dorado Main pipeline is comparable to the instant El Dorado Main No. 2. The two lines originate at the same point, follow very closely the same route within one-half to three-quarters of a mile of the other, and, where adjacent and parallel, connect the same reservoirs. With the exception of a big canyon crossing and a bench cut area on the El Dorado Main No. 2, the terrain, including tree density, on the two lines is quite similar.

(b) The El Dorado Main was constructed with 40 foot lengths of mortar-lined and coated pre-tension steel pipe manufactured by Ameron, the same type of pipe laid by plaintiff on the El Dorado Main No. 2.

(c) On the cover of the El Dorado Main No. 2 specifications is a photograph taken during the construction of the El Dorado Main. This picture shows a sideboom caterpillar tractor laying the same type of pipe on the El Dorado Main as plaintiff laid on the El Dorado Main No. 2.

(d) The El Dorado Main contractor was not allowed to clear cut 14 feet on each side of the trench.

(e) The El Dorado Main contractor was not allowed to cut a passageway for the movement of equipment on both sides of the trench.

(f) The El Dorado Main contractor was able to lay pipe through orchards quite successfully without cutting down any fruit trees.

69. In 1975 the Bureau published Specifications for the construction of the Pleasant Oak Main pipeline in El Dorado County near Placerville, California.

70. Both the El Dorado Main No. 2 and the Pleasant Oak Main lie in El Dorado County, California; they run in an east-west direction approximately 4 to 4½ miles from each other.

71. (a) Pleasant Oak and the instant project are very similar.

(b) The principal features of the Pleasant Oak Main pipeline work consisted of furnishing and laying pipe and the construction of two concrete lined reservoirs, pressure reducing stations, and other structures for approximately 14 miles of pipe.

72. The topography, including tree density, of the Pleasant Oak Main and the El Dorado Main No. 2 rights-of-way was similar, with the exception of the bench cut area and the big canyon crossing on the El Dorado Main No. 2.

73. The Pleasant Oak Main specifications and the El Dorado Main No. 2 specifications both contained Paragraph 1.6.2., entitled "Preservation of Trees" with identical language in its first two paragraphs.

74. Both the Pleasant Oak Main specifications and the El Dorado Main No. 2 specifications included a Paragraph 2.1.1., entitled "Clearing," in which the first paragraph was identical.

75. (a) Prior to submitting his bid on the El Dorado Main No. 2 project, Mr. Small visited the Pleasant Oak Main pipeline project site.

(b) Small went out to see the Pleasant Oak Main job as part of his bid preparation and relied on the cost figures for the Pleasant Oak Main job in preparing plaintiff's bid in this case. In preparing plaintiff's bid, Small made a comparison to the inch-feet of pipe involved and the cost involved in the Pleasant Oak Main project.

76. Mr. Leo Tuccori, the Government's expert witness on pipeline construction, was vice-president and construction manager of the company that installed the Pleasant Oak Main pipeline and submitted a bid on the instant project.

77. The Pleasant Oak Main contractor laid pipe with a sideboom caterpillar tractor, a 15-ton Galion crane and boom trucks.

78. In the opinion of Mr. Tuccori, the Pleasant Oak Main and the El Dorado Main No. 2 were very similar jobs. The two projects were similar as to terrain, distance covered, pressure reducing stations, forestation and size of pipe.

79. Both projects involved 14 miles of main line irrigation pipe of approximately the same diameter, in close proximity in El Dorado County, Calif. Moreover, the relevant specification language regarding tree

preservation and clearing are identical, as were the chief inspectors enforcing that language, Messrs. Smith and Tally.

80. (a) The Pleasant Oak Main contractor was not allowed to clear cut.

(b) On the Pleasant Oak Main there were numerous areas where the contractor did not have access immediately adjacent to the trench. In those cases, the contractor went around trees and came back in.

(c) After the initial clearing operations on the Pleasant Oak Main project, there were trees within 14 feet of each side of the trench. Pictures in the record show the Pleasant Oak Main contractor working among the trees within 14 feet of the trench and in several cases pictures show trees within 14 feet of both sides of the trench.

(d) There were several occasions on the Pleasant Oak Main where the distances between trees proved to be a little too tight during pipeline operations, and the contractor was allowed to cut down additional trees.

(e) On the Pleasant Oak Main the contractor generally worked on one side of the pipe trench.

(f) Had Mr. Tuccori's former firm been awarded the El Dorado Main No. 2 contract, he would have expected clearing on the El Dorado Main No. 2 site similar to that he had had on the Pleasant Oak Main project.

81. There is no appreciable difference between the two projects in the number of trees on the respective project contract tree lists which remained standing after clearing.

82. (a) The peak labor force recorded on plaintiff's payroll for the construction job was approximately 30. This peak was reached in July 1978, approximately 18 months after the contractor began work.

(b) The peak labor force recorded on the payroll of the Pleasant Oak Main contractor was approximately 78. This peak was reached during August 1975, the fifth month after the contractor began work.

83. (a) Plaintiff reported a total of 79,-814 manhours on its certified payroll records to complete the job.

(b) The Pleasant Oak Main contractor reported a total of 56,598 man hours of labor (or 58,957 hours if subcontracted reservoir work is added) on its certified payroll records to complete the job.

84. (a) Plaintiff reported on its certified payroll records a labor cost of approximately $877,580.65 for the substantially completed job.

(b) The Pleasant Oak Main contractor reported a labor cost of $585,095.41 (or $607,-515.39, adjusted) on its certified payroll records for the substantially completed job.

85. The Pleasant Oak Main contractor completed pipeline installation approximately 5 or 6 months ahead of schedule. Plaintiff was 166 days late.

## Weather and Liquidated Damages

86. Paragraph 1.2.4. of the Specifications provides that if the contractor fails to complete the work "within the time fixed in the contract or any extensions thereof, the contractor shall pay to the Government as ... liquidated damage ... $500 for each calendar day of delay in completion of the work."

87. Paragraph 5(d)(1) of the General Provisions of the contract provides that the contractor shall not be charged for delay which arises, among other things, from "unusually severe weather":

> The Contractor's right to proceed shall not be so terminated nor the Contractor charged with resulting damage if:
>
> (1) The delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to, acts of God, acts of the public enemy, acts of the Government in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargos, unusually severe weather, or delays of

subcontractors or suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and such subcontractors or suppliers * * *.

88. (a) In September 1978, plaintiff claimed excusable delays for: unusually severe weather during the previous winter (1977–78), strikes at a pipe supplier and a steel supplier during 1978, delay in acquiring a state Department of Transportation encroachment permit, and changes in valving and piping for pressure-reducing stations.

(b) Plaintiff did not ask, in its requests for extensions based on these alleged delays, and does not contend that the extensions granted should have been lengthened because of foreseeable bad winter weather which would be encountered.

(c) Plaintiff was eventually granted a 113-day extension for one strike, unusually severe weather for the winter of 1977–78, and the permit delay. Plaintiff was also granted an extension of 30 days for each of two change orders. The original contract completion date of September 4, 1978 was therefore extended to February 24, 1979.

(d) On the basis of unusually severe weather through February 24, 1979, plaintiff was granted 11 additional calendar days by the contracting officer, for a total contract extension through March 7, 1979.

89. (a) The contract was accepted as substantially complete on August 20, 1979, or 166 days after March 7, 1979. Thus the total liquidated damages claimed by the Government is $83,000 ($500 × 166 days). The Government has retained $75,000 of the contract price, and it claims a net judgment in its favor in the amount of $8,000.

(b) Plaintiff claims an additional 115 calendar days or 82 working days, between November 13, 1978, and May 8, 1979, because of "inclement" winter weather.

(c) Plaintiff did not seek to prove and does not contend that these days of alleged inclement weather were unseasonably severe within the usual meaning of the relevant contract clause. Plaintiff rather contends it is entitled to this extension irrespective of whether the inclement weather constituted unusually severe weather, since, it is said, the project would have been completed prior to this inclement weather except for the excusable delays which were beyond its control.

(d) Plaintiff's position is that the claimed 115-day weather delay and the claimed 157 calendar day delay because of insufficient access caused by standing trees extend beyond August 20, 1979, the date of acceptance of the project as substantially completed. Accordingly, plaintiff claims the $75,-000 withheld, in addition to damages for defendant's breach.

### The Nature of the Weather Claimed as Inclement

90. (a) Set out in the table below is the precipitation on the 82 working days from November 13, 1978, through May 8, 1979 (according to data from the Institute of Forest Genetics of the U.S. Forest Service), on which the plaintiff claims that it was unable to work on "controlling" items of work (i.e., pipelaying) due to inclement weather, as well as notations regarding weather from Otto Wunschel's diary and the Inspector's Daily Reports for the pipe crew on those days.

Weather Claim

| | Plaintiff Weather Claim Days | O. Wunschel Diary | USBR Inspectors Reports | Forest Genetics Rain/Snow |
|---|---|---|---|---|
| Nov. 78 | | | | |
| | 13 | Rain | Rain – Working Conditions Poor | .52″ / T |
| | 14 | | Clear – Working Conditions Good | – – |

| | Plaintiff Weather Claim Days | O. Wunschel Diary | USBR Inspectors Reports | Forest Genetics Rain/Snow |
|---|---|---|---|---|
| | 20 | Rain | Rain – Working Conditions Poor | .96 |
| | 21 | Rain | Rain – Working Conditions Poor | 1.00 / T |
| Dec. 78 | 22 | Rain | Rain – Working Conditions Poor | .32 |
| | 1 | | Rain – Working Conditions Poor | 1.29 |
| Jan. 79 | 18 | Rain | Rain – Working Conditions Poor | 1.26 |
| | 5 | Rain | Rain – Working Conditions Wet, Slippery, Good, Bad | .06 |
| | 8 | Rain | Rain – Working Conditions Wet, Muddy | 1.43 |
| | 9 | | Rain – Working Conditions Wet, Muddy | .23 |
| | 10 | Rain | Rain – Working Conditions Wet, Muddy | .04 |
| | 11 | Rain | Rain – Working Conditions Muddy | 4.20 |
| | 12 | Rain | Rain – Working Conditions Muddy | .02 |
| | 15 | Rain – Heavy | Rain – Working Conditions Wet | 1.79 |
| | 16 | Sunny, | Clear – Working Conditions Wet | .05 |
| | 17 | | Cloudy and Cool – Working Conditions Fair, Mud | – – |
| | 18 | | Cloudy and Cool – Working Conditions Fair to Poor, Mud | .18 / 1.0 |
| | 19 | | Clear – Working Conditions Muddy, Fair to Good | – – |
| | 22 | | Clear – Working Conditions Muddy, Good No trench pipe laid day shift | – – |
| | 23 | | Clear – Working Conditions Good | – – |
| | 24 | | Cloudy, Fog – Working Conditions Fair | – – |

| Plaintiff Weather Claim Days | O. Wunschel Diary | USBR Inspectors Reports | Forest Genetics Rain/Snow |
|---|---|---|---|
| 25 | | Clear – Working Conditions Fair to Good | .12 / 1 |
| 26 | | Clear – Working Conditions Fair to Good | – – |
| 29 | | Clear – Working Conditions Good | – – |
| 30 | Snowed out at 3:30 | Rain and Snow – Working Conditions Fair, Slick, Muddy | T / 1/2 |
| 31 | Snow | Rain – Working Conditions Poor, Mud | .59 / 2 |

**Feb. 79**

| | | | |
|---|---|---|---|
| 1 | Rain | Snow – Working Conditions Poor | .19 / 2.5 |
| 2 | Rain | Clear to Cloudy – Working Conditions Fair | .07 / 1.5 |
| 5 | | Clear to Cloudy – Working Conditions Wet, Fair to Good | – – |
| 6 | | Clear – Working Conditions Good | – – / – – |
| 7 | | Clear to Cloudy – Working Conditions Wet, Good | – – |
| 8 | | Clear – Working Conditions Good | – – |
| 9 | | Clear – Working Conditions Good | – – |
| 12 | | Cloudy – Working Conditions Good | – – |
| 13 | | Rain – Working Conditions Poor to Very Poor, Muddy, Wet | 1.05 |
| 14 | | Rain – Working Conditions Good In P.M., Muddy | 1.01 |
| 15 | | Partly Cloudy – Working Conditions Good, Muddy | – – |
| 16 | | Rain – Working Conditions Poor – Muddy | .82 |
| 19 | | No Report | – – |
| 20 | Rain Showers | Rain – Working Conditions Wet, Muddy | 1.90 |

| Plaintiff Weather Claim Days | O. Wunschel Diary | USBR Inspectors Reports | Forest Genetics Rain/Snow |
|---|---|---|---|
| 21 | Snow/Rain | Rain and Snow – Working Conditions Very Poor | 1.27 / 1 1/2 |
| 22 | Snow | Rain and Snow – Working Conditions Very Poor | .7 / 4 |
| 23 | Rain | Rain and Snow – Working Conditions Very Poor | .69 |
| 26 | Rain Showers | Showers – Working Conditions Muddy | .44 |
| 27 | Sunny | Clear – Working Conditions Muddy | – – |
| 28 | Rain | Rain – Working Conditions Very Poor, Muddy | .31 |

March 79

| Plaintiff Weather Claim Days | O. Wunschel Diary | USBR Inspectors Reports | Forest Genetics Rain/Snow |
|---|---|---|---|
| 1 | Snow | Rain and Snow – Working Conditions Very Poor, Mud | 1.96 / 6 |
| 2 | | Partly Cloudy – Working Conditions Good | .02 |
| 5 | [pipeline operation questionable due to muddy & wet access areas] | Partly Cloudy – Working Conditions Fair to Good, Mud | .15 |
| 6 | | Clear – Working Conditions Good | – – |
| 7 | | Clear – Working Conditions Good | – – |
| 8 | | Clear – Working Conditions Good | – – |
| 9 | | Clear – Working Conditions Good | – – |
| 12 | | Clear – Working Conditions Good | – – |
| 13 | | Cloudy, Fog – Working Conditions Good | – – |
| 14 | | Cloudy – Working Conditions Good | – – |
| 15 | Rain | Rain – Working Conditions Very Poor, Muddy, Wet | 1.73 |
| 16 | Rain | Rain – Working Conditions Very Poor, Muddy, Wet, Slick | .42 |

| Plaintiff Weather Claim Days | O. Wunschel Diary | USBR Inspectors Reports | Forest Genetics Rain/Snow |
|---|---|---|---|
| 19 | | Partly Cloudy – Working Conditions Wet | .13 |
| 20 | | Cloudy – Working Conditions Good | – – |
| 21 | | Cloudy – Working Conditions Good to Poor, Wet | .02 |
| 22 | Rain Showers | Rain – Working Conditions Slick, Very Poor | .05 |
| 23 | | Partly Cloudy – Working Conditions Fair to Good, Wet | T |
| 26 | Showers | Rain – Working Conditions Fair, Slick, Wet | .11 |
| 27 | Rain | Rain – Working Conditions Muddy | 1.55 |
| 28 | | Cloudy – Working Conditions Muddy | .78 |
| 29 | | Partly Cloudy – Working Conditions Good | .10 |
| 30 | | Cloudy – Working Conditions Good | T |
| Apr. 79 | | | |
| 2 | | Clear – Working Conditions Good | – – |
| 3 | | Clear – Working Conditions Good | – – |
| 4 | Sunny | Clear – Working Conditions Good | – – |
| 5 | | Clear – Working Conditions Good | – – |
| 6 | Rain Showers? | Rain – Working Conditions Fair to Poor, Slick Mud | .38 |
| 16 | Rained out | Rain – Working Conditions Fair, Wet | .15 |
| 17 | Rain | Rain – Working Conditions Very Poor | .41 |
| 18 | | Cloudy – Working Conditions Good to Fair | .03 |
| 23 | Rain | Rain – Working Conditions Worked Inside, Good [no pipe laid day shift] | .72 |

| | Plaintiff Weather Claim Days | O. Wunschel Diary | USBR Inspectors Reports | Forest Genetics Rain/Snow |
|---|---|---|---|---|
| | 24 | | Partly Cloudy – Working Conditions Good, muddy | – – |
| | 26 | Rain | Rain – Working Conditions Good to Poor | .44 |
| | 27 | | Partly Cloudy – Working Condition Good | .11 |
| May 79 | 7 | Rain | Rain – Working Conditions Fair to Good, Very Muddy | 1.11 |
| | 8 | | Rain – Working Conditions Fair to Good | .32 |

(b) On 30 of the 82 claimed days, the record shows no precipitation. On 48 of the 82 days, the record shows less than ¼ inch of precipitation.

91. (a) Plaintiff claims that it was unable to work on critical work, i.e., pipelaying, due to inclement weather during every work day from January 5, 1979, through April 9, 1979.

(b) In this period, January through early April 1979, the plaintiff ceased working on mainline pipe work and concentrated its efforts on the construction of pressure reducing stations. On several days in this period plaintiff poured concrete or laid pipe associated with pressure reducing stations or back-filled or did other work.

92. (a) On 13 days during this period (November 21, 1978; December 1, 18, 1978; January 8, 11, 15, 1979; February 13, 14, 20, 21, 1979; March 1, 15, 27, 1979) precipitation amounted to 1 inch or more and the Bureau inspector's report comments on the deficient working conditions.

(b) On 3 additional days the weather was also bad:

February 22 was a day of 4 inches of snow and .7 inches of rain, following a day of 1.27 inches of rain.

February 23 was a day of .69 inches of rain, on which the inspector's report said "working conditions very poor."

March 16 was a day of .42 inches of rain following a day of 1.73 inches of rain; the inspector's report said "working conditions very poor."

Damages From the Alleged Denial of Access—The Claim

93. Plaintiff's damage claim is that the lack of access due to tree obstructions resulted in extra work, costs and expenses to the contractor in performing the pipeline installation and final cleanup work in the total amended principal amount of $764,-900.93 (originally claimed to be $839,594), computed and itemized as follows:

A. Additional cost incurred by reason of low production due to insufficient operating space and unreasonable access:

1. Actual working days required to install pipe = 366 working days

2. Scheduled working days to install pipe = 250 working days

3. Additional working days req'd to install pipe = 116 working days

4. Installation crew (labor & equipment)
   a. Labor cost per day (13-man crew) 151.155 x 8 hrs. = $ 1,209.24

b. Labor fringes, taxes, insurance 52.16% x $1,209.24 = 630.74

c. Equipment cost per day 191.51 x 8 hrs = 1,532.08

d. Total cost of installation crew per day = 3,372.06

e. Overhead 10.25% x $3,372.06 = 345.64

f. Total installation cost plus overhead = 3,717.70

g. Margin 10% x $3,717.70 = 371.77
   $4,089.47

5. Total cost of installation crew (labor and equipment) per day = 4,089.47

6. Total cost of 116 additional working days 116 x $4,089.47/day = $474,378.52

B. Cost of additional crew required due to adverse conditions created by insufficient operating space and unreasonable access:

1. Additional labor and equipment required due to access difficulties

   a. Additional labor cost per day (3 extra workers) 34.68 x 8 hrs. = 277.44

   b. Labor fringes, taxes, insurance 52.16% x $277.44 = 144.71

   c. Equipment cost per day 30.50 x 8 hrs = 244.00

   d. Total cost of additional labor & equipment per day = 666.15

   e. Overhead 10.25% x $666.15 = 68.28

   f. Total additional cost plus overhead = 734.43

   g. Margin 10% x $734.43 = 73.44
      $807.87

2. Total cost of additional labor and equipment required due to access difficulties per day = 807.87

3. Total additional cost for 250 working days 250 x $807.87/day = $201,967.50

C. Additional cleanup expense resulting from working around trees and additional clearing after initial clearing operations:

1. Labor and equipment required for cleanup

   a. Cleanup labor cost per day (6-man crew) 64.235 x 8 hrs. = 513.88

   b. Labor fringes, taxes, insurance 52.16% x $513.88 = 268.03

   c. Cleanup equipment cost per day 66.11 x 8 hrs. = 528.88

   d. Total cost of cleanup crew per day = 1,310.79

   e. Overhead 10.25% x $1,310.79 = 134.35

   f. Total cleanup cost plus overhead = 1,445.14

   g. Margin 10% x $1,445.14 = 144.51
      $1,589.65

2. Total cost of typical cleanup crew per day = 1,589.65

3. Actual working days required for cleanup (5/11/79 – 9/12/79) = 59 working days

4. Scheduled working days for cleanup = 30 working days

5. Additional working days required for cleanup = 29 working days

6. Total cost of 29 additional cleanup days 29 x $1,589.65/day = $46,099.85

D. Interest on loans to finance the added cost of the extra work = 25,233.78

E. Attorneys fees necessarily incurred for the continued performance of the work: = $9,648.00

F. Aggregate additional costs: = $757,327.65

G. Bond Fee 1% x $757,327.65 = $7,573.28

TOTAL DAMAGES = $764,900.93
(Exclusive of prejudgment interest under 41 USC § 611)

The State of the Record as to Damages

94. There is in the record no document prepared prior to the bid which records the plaintiff's claimed projections of 250 days for pipe installation, as claimed, productivity as claimed of 300 feet of pipe to be laid per day, the projected size of crews, and the items of equipment to be used. Such prebid document as is in evidence shows only work to be accomplished and cost, without detail as to days, crews and equipment to be used.

95. (a) Paragraph 1.2.6. of the specifications provides, in part:

a. General.—Within 45 calendar days after date of receipt of notice to proceed, the contractor shall submit to the contracting officer for approval a complete and practicable construction program.

\* \* \* \* \* \*

Timely submittal of the construction program and timely revisions thereto are important .... Accordingly, the contractor will be assessed as fixed, agreed and liquidated damages a sum of $20 per day for each calendar day's delay the contractor's original construction program is late.

(b) Plaintiff's construction program was prepared pursuant to the contract specification requirement that a construction program be submitted within 45 days after receipt of notice to proceed. Plaintiff was not able to prepare the required construction program within the required 45-day period and was charged liquidated damages for a period of time for this failure.

(c) The construction program contains no information regarding the crews or equipment required to achieve the projected progress in the program.

96. Books and records were available to document the claim only as stated below, in amounts reduced from plaintiff's claim, as follows:

(a) Labor fringes, taxes and insurance were claimed at 70 percent of direct labor and verified as 52.15 percent. This figure is now accepted by plaintiff;

(b) Overhead was verified and now accepted by plaintiff as 10.25 percent rather than 15 percent as claimed;

(c) Interest claimed was verified at $25,-234; the item is disputed by defendant as a matter of law;

(d) Legal fees were verified as $9,648, a figure now accepted by plaintiff;

(e) Bond fee, claimed at 1 percent, was verified at .525 percent;

The Audit by the Government

97. (a) Mr. Edwin Robinson of the Department of Interior, Inspector General's office, was in June 1981 assigned to audit plaintiff's claim. He conducted the audit at the office of the contractor's accountant and at the contractor's office and residence. He audits claims, contracts, grants and pre-award cost projections by contractors.

(b) Mr. Robinson has an accounting degree from Chico State University, California, in 1962. After graduation, he worked for the General Accounting Office for 6½ years. In March 1969, he transferred to the Department of the Interior and since that time he has worked as an auditor.

98. (a) Mr. Robinson and an assistant worked on the audit for approximately two and one-half weeks. He relied on the plaintiff's records, interviews with Sam Small, Mrs. Sam Small, who worked for the plaintiff as a bookkeeper and secretary-treasurer, and Mr. Sam Gallina, the plaintiff's accountant.

(b) The audit was conducted consistently with the auditing standards generally prescribed by the Comptroller General. These standards incorporate the auditing standards of the American Institute of Certified Public Accountants.

(c) The purpose of the audit was to determine whether the elements of the contractor's claim were supported by costs recorded in the contractor's books and records.

(d) As to each element of the contractor's claim, Mr. Robinson asked the contractor what documents were available to support its claim, and he reviewed the information provided.

(e) Mr. Robinson reviewed all data provided to him by the contractor which he was told had been relied upon in making the claim.

99. (a) After the audit, Mr. Robinson inquired of the Government's representatives whether the contractor's labor and equipment claims would be supported by the Government's records. The reply was that although the records would indicate what pieces of equipment were on the job and the number of men on the job, the adequacy of this information for allocating labor and equipment costs to the elements of the claims was questionable.

(b) After preparing his audit report, Mr. Robinson reviewed the Government's daily inspection reports in an effort to determine whether the records would support the contractor's equipment claims. He found that some of the major claimed items of equipment, for example, the crane and the sideboom "cat" were not on the job every day, as is assumed by the plaintiff's claim. In addition, on many days, only one loader, not two as claimed, were listed as being on the job site.

(c) Mr. Robinson concluded that even using the Government daily inspection reports, he would not have an adequate record to establish the number of hours that a given piece of equipment was used as opposed to the number of hours that it was idle. There was, thus, at least some time during which the contractor's claimed equipment was either idle or not on the job.

100. Government representatives were unable to supply any personal knowledge concerning labor and equipment used on the project that could verify the plaintiff's claim.

101. (a) Mr. Robinson concluded that the Government's records would not substantiate the labor costs amounts claimed by the plaintiff because they failed to state which persons were specifically working on which of claimed elements of damages. After March 31, 1978, none of the laborers costs were allocated to the various jobs such as pipelaying and cleanup. The costs of the various elements of work cannot be segre-

gated either from plaintiff's books or in the inspection reports.

(b) The conclusion of the audit was that $133,782 of the amount claimed be disallowed, and, because the plaintiff's records did not identify costs as being related to work performed, no opinion was expressed on the remaining $705,812.

(c) Differences between the foregoing figures and those now claimed are due to concessions by plaintiff subsequent to the audit.

Specifics of the Claim for 116 Alleged
Additional Days of Pipelaying

102. Plaintiff's claim is that its "typical" pipelaying installation crew worked 8 hours per day for 366 days; that these 366 days consisted of 250 days that were originally estimated for completing the project, plus 116 additional crew days required as a result of the defendant's alleged failure to provide reasonable access for the plaintiff's construction equipment.

103. Plaintiff attributes the total costs associated with pipelaying for the 116 allegedly required "additional" days to the inadequate and unreasonable access afforded by the Government.

104. The daily inspection reports kept by the Bureau indicate that pipe was installed for payment on only 329 of the 366 days plaintiff asserts were pipe-installation working days. In this connection plaintiff maintains, however, that several additional days were included in this 366 days for crews moving from one location to another on the pipeline, and stringing or preparing to lay pipe.

105. Plaintiff's payroll records show that in the 366 day claimed period during which it is contended that pipe installation took place, a crew of 13, drawn from the combined list of the 13 members of the "typical" installation crew and the six substitutes named by plaintiff's witness, worked on only 155 days. On the remaining 211 days, smaller crews were working.

106. (a) The certified payroll records show that the 13 persons on the crew and

the six named substitutes or replacements worked many days in excess of the identified 366 day period during which plaintiff alleges that pipe installation occurred, indicating that they worked on many functions of the job other than pipelaying.

(b) From the plaintiff's records, it cannot be determined what job functions were being performed by individual workmen.

107. The major components of the claims are labor and equipment. As to labor, the claim is based on an alleged "typical installation crew" for pipelaying and for cleanup. Plaintiff had no records which would show which individuals worked on pipelaying functions and for how long. It appears that individuals listed on plaintiff's pipelaying crew were not necessarily laying pipe when they were carried on the certified payroll during the period claimed.

108. (a) Until March 31, 1978, plaintiff accounted for its labor costs separately, on its cost ledger cards, by job function, such as pipelaying, cleanup, etc., but did not do so thereafter.

(b) It is common in the pipeline construction industry for a company to keep records allocating costs to specific job functions such as pipelaying.

(c) Plaintiff's payroll records, however, fail to identify the number of hours that workmen spent laying pipe, cleaning up, or any other specific construction activity after March 31, 1978.

(d) Plaintiff's books and records thus provided no verification as to whether alleged increased labor costs were incurred in pipelaying and cleanup operations as opposed to other job functions.

109. After March 31, 1978, the contractor used hourly rates for equipment that were determined in-house and applied these on its cost records, based on the number of hours worked as reported in the field. This information was not retained and could not be audited by defendant.

110. The record does not contain any bid preparation documents showing that the contractor's original bid estimate was based upon 250 pipelaying days and no records

showing what persons worked on pipelaying functions and for how long.

111. The record therefore provides no basis for showing the number of hours that plaintiff's workmen spent laying pipe, cleaning up, or on any other specific construction activity after March 31, 1978.

112. The record provides no basis for confirming the contractor's claimed increased labor costs incurred in pipelaying operations due to allegedly insufficient operating space and denial of access during pipelaying operations and thus providing no basis for verifying that the claimed additional 116 days of pipe installation constituted "excess" work over that anticipated.

The Claim for Costs of Cleanup

113. (a) The plaintiff claims that it anticipated spending 30 working days on cleanup and that its typical clean-up crew of six employees actually spent 59 working days on clean-up activities. Thus, the typical clean-up crew spent 29 "additional" working days "resulting from working around trees and additional clearing after initial clearing operations."

(b) There is no record showing that 30 working days by six employees were anticipated for cleanup, at the time the bid was prepared.

(c) There is no record of specific employees who worked on cleanup.

(d) There is no record showing that six employees worked on cleanup for 8 hours each day, on 59 days for cleanup.

(e) In most cases such records as are available show that "some" dressing and cleaning was done on the day. Other functions could have been performed.

114. The record contains no basis confirming the alleged increased costs of cleanup.

The Claim for Equipment Costs

115. The claim for equipment is $254,-059. The claim was not verified in the Government's audit.

116. It is common in the pipeline industry for companies to keep equipment time cards which record the use time, as opposed to idle time, of the equipment on the job.

117. Until March 31, 1978, plaintiff maintained records which allocated the cost of its equipment by job functions, such as pipelaying, cleanup, etc.

118. After March 31, 1978, the plaintiff used hourly rates that were determined "in-house." On its cost records, it then applied this rate to the number of hours that the equipment was used, as reported from the field. The data was informally reported and the plaintiff did not retain it. The underlying data to show the amount of equipment time was thus not available.

119. (a) All equipment costs claimed by the plaintiff were at operating rates for 8 hours for each work day. The claim makes no allowance for idle time.

(b) For purposes of pricing change orders, and differing site conditions, the contract requires that "idle" time and "operating time" are under the contract to be distinguished, if equipment ownership rates were to be used. Idle time is allowed at half the ownership rate.

(c) The plaintiff's records do not show how many hours its equipment was actually on the job site or how many hours per day its equipment was in actual use, as opposed to remaining idle.

120. (a) There are provided no records to substantiate plaintiff's claim that all equipment was working on pipelaying activities for 8 hours per work day for the entire period claimed.

(b) For example, where Associated General Contractor (AGC) rates were not used, plaintiff, using an estimated rate of $100 per day, claimed $11,600 for the use of trench jacks for 116 days.

(c) Jacks used on the project were purchased in 1968 at a cost of $5,708 (and they were fully depreciated on the plaintiff's books before the project started). The plaintiff's records show that it incurred rental and repair costs for trench jacks of $6,367. At the claimed rate of $100 per day, the plaintiff would recover $11,600 for the 116 "additional" pipelaying days, or almost the entire total costs of original purchase rentals and repair.

(d) The plaintiff's records show that it purchased two 3-inch air vibrators on September 15, 1977, at a cost of $1,833.80 each. It claims the use of one such vibrator at the rate of $2 per hour for the 116 "additional" pipelaying days. The total amount claimed is $1,856 [2 × 8 × 116] which excluding any repair and maintenance costs exceeds the original acquisition cost.

(e) The plaintiff claimed $7,760 for small tools. It arrived at this figure by estimating costs of the small tools at 5 percent of the claimed direct labor costs.

(f) The contract specifications provide that for contract modifications of $100,000 or less, at the option of the contracting officer, a contractor may be allowed a sum for small tools, "not to exceed 5 percent of direct labor * * * where appropriate."

(g) The $7,760, claimed for small tools for 116 days of pipelaying and 29 days of cleanup, almost equal to the $7,771 recorded in the job cost ledger as the total cost of miscellaneous tools and supplies for the entire construction project.

Intermediate Conclusions of Fact and Law

121. Plaintiff did not, until September 14, 1978, provide the Government with the written notice required by the specifications in cases of disagreement or potential claims.

122. The Government's administration of its right under the contract was a reasonable and orderly procedure, in accordance with the contract, in clearing for the construction of a pipeline in this area.

123. The contracting officer's interpretation of the tree preservation and clearing specifications was (a) administratively justified and proper under the contract; (b) consistent with the practices of the pipeline industry operating in the Sierra Mountain area in California, and (c) has not been shown to be other than a reasonable balancing of the needs of the contractor with the preservation of the environment and the minimization of disturbances to property owners and the Government's costs of reimbursement of owners for lost trees.

124. (a) The specifications, which plaintiff is presumed to have read and under-

stood, negate any reasonable belief by plaintiff that it would be allowed or entitled to clear completely 14 to 15 feet on both sides of the pipe trench or, indeed, that it would be allowed or entitled to clear completely a specific number of feet on either side of the pipelaying trench.

(b) There is no credible evidence that plaintiff based its bid on an assumption that it would be allowed to clear completely 14 to 15 feet on both sides of the trench. The evidence is to the contrary.

(c) Plaintiff has not borne its burden of showing that it did experience significant unanticipated delays or disruptions as a result of tree obstructions.

125. The plaintiff has not met the burden of proof as to its costs in excess of those anticipated.

126. Plaintiff has failed to demonstrate that there was any excusable delay by reason of unusually severe weather justifying an extension beyond that already allowed administratively.

127. (a) Substantial completion, due under the contract as extended on March 7, 1979, was by the decision of the contracting officer delayed until August 20, a total of 166 days. At $500 per day of liquidated damages, the total payable as liquidated damages is $83,000. Defendant retained $75,000 otherwise due under the contract, on account of liquidated damages and counterclaims for an additional $8,000 for a total of $83,000. There is no defense to the counterclaim, on the finding, above, of no further excusable delay than allowed administratively, and no further extension of time to be recognized.

(b) Plaintiff is therefore liable to defendant for the sum claimed in the counterclaim, $8,000.

### CONCLUSION OF LAW

Upon the findings and foregoing opinion, it is concluded as a matter of law that defendant is entitled to recover from plaintiff the sum of eight thousand dollars ($8,000.00), and judgment is entered for defendant in that amount.